```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                         WESTERN DIVISION

 3   JOSEPH LAUDICINA,              )  Docket No. 17 C 50177
                                    )
 4               Plaintiff,         )  Rockford, Illinois
                                    )  Tuesday, April 10, 2018
 5      vs.                         )  10:00 o'clock a.m.
                                    )
 6   CITY OF CRYSTAL LAKE,          )
     et al.,                        )
 7               Defendant.         )
                                    )
 8
                        TRANSCRIPT OF PROCEEDINGS
 9            BEFORE THE HONORABLE IAIN D. JOHNSTON

10   APPEARANCES:

11   For the Plaintiff:        FOUTRIS LAW OFFICE, LTD.
                               (53 West Jackson Boulevard,
12                              Suite 252,
                                Chicago, IL  60604) by
13                             MR. BASILEIOS J. FOUTRIS

14   For the Defendant:        THE SOTOS LAW FIRM, PC
                               (550 East Devon Avenue,
15                              Suite 150,
                                Itasca, IL  60143) by
16                             MR. DAVID A. BRUEGGEN

17   Court Reporter:           Heather M. Perkins-Reiva
                               327 S. Church Street
18                             Rockford, Illinois  61101
                               (779) 772-8309
19

20

21

22

23

24

25
```

1          THE CLERK:  Calling 17 CV 50177, Laudicina v. City of

2  Crystal Lake, et al.

3          MR. FOUTRIS:  Good morning, your Honor.  Basileios

4  Foutris for the Plaintiff.

5          THE COURT:  Good morning, Mr. Foutris.

6          MR. BRUEGGEN:  Good morning, Judge.  Dave Brueggen on

7  behalf of the Defendants.

8          THE COURT:  Good morning.

9          All right.  I have the parties' filings.  I have the

10  motion, Mr. Foutris's response.  I have read those and done my

11  own research.  I have thought about it.

12          It is your motion.  Let me hear from you.  And then I

13  will hear from Mr. Foutris.  And then we will see where we go.

14          MR. BRUEGGEN:  Judge, as we laid out in the motion,

15  we think there is, if you will, two elements to this.  There

16  is one where the mental records are relevant to the factual

17  situation.  The Escobedo case talked about that you should

18  consider the Plaintiff be taken as he comes to the incident.

19  There is many statements by many witnesses, including

20  Plaintiff's sister-in-law.

21          THE COURT:  The Escobedo case -- I already

22  interrupted you, and I apologize -- that's a trial case, not a

23  discovery case?

24          MR. BRUEGGEN:  Correct, Judge.  They had allowed

25  discovery on it.  This is admissibility at trial.  So, again,

1    here we are just on discoverability.

2          So the day of the incident, the Plaintiff made

3    several suicidal comments to multiple people, which begs the

4    question of whether this is potential suicide by cop, and then

5    there is a history of his suicidal statements, including three

6    suicidal -- three hospitalizations in the seven months before.

7    So that's kind of, if you will, relevant to the facts of the

8    situation and what happened on that event.

9          Then there is the second part, which is the relevancy

10   to damages.  Again, we believe the Plaintiff has put his

11   mental state at issue because he is seeking recovery for

12   emotional anxiety and mental trauma.  It is not just simple

13   garden variety.  I know he said that.  But if you look at the

14   cases, there is some question about this garden variety.  The

15   Doe case, I believe, is the one from the Seventh Circuit that

16   talks about opening the door, and a more recent case is Taylor

17   that interprets Doe as the broad interpretation.  So if you

18   are seeking any mental health or emotional damages, you have

19   opened the door to all of them, because they don't know if

20   this whole idea of garden variety, how that can be done

21   effectively at trial where a plaintiff says, "Oh, I feel sad,"

22   but then the defense is unable to question that without

23   possibly opening the door.

24          THE COURT:  We kind of do that all the time, though,

25   don't we?

1          MR. BRUEGGEN:  We try, Judge, yes.  To some extent,

2     it can be -- I'm not saying it can be done, but I think the

3     Flowers case really laid out the difficulty of this, about

4     what is/is not, what is in/what is out, that there can be

5     difficulty in doing that.  Obviously, at trial, I think that

6     is more of an admissibility thing down the road, not

7     necessarily a discoverability thing.

8          Then the third element is just the Plaintiff, we

9     anticipate, is going to claim disability or ongoing

10    disability.  We think it is appropriate to know what his level

11    of functioning was prior to the incident versus level of

12    functioning after the incident, and, unfortunately, mental

13    health does play a role in someone's functioning in society

14    and ability.

15         THE COURT:  The Flowers case, which, of course, Judge

16    Cole -- this is classic Judge Cole.  So now you have every

17    case you ever need to know on the issue discussed in one

18    opinion.  Because I'm wearing a black robe, I can say this,

19    because I have immunity.

20         I started my question with "We do it all the time."

21    The clear problem in that is the plaintiff's attorney.

22    Mr. Foutris is not that attorney.  I have dealt with both of

23    those.  It's night and day, very different.

24         So that's kind of where the issue went sideways in

25    Flowers, is in the deposition, plaintiff's counsel misbehaves,

1    let's say, and started testifying about the scope of what

2    garden variety would be, and his interpretation of what garden

3    variety is is not in any rational human being's interpretation

4    of garden variety.  So that's where that is.

5            So what Judge Cole does, and it makes sense from

6    judicial management, after he goes through the -- lays out all

7    the factors and those types of things and the different

8    analyses, basically comes to the point of based upon what

9    plaintiff had testified to in his deposition and what

10   plaintiff's counsel is saying he thinks garden variety is, it

11   is not garden variety, and he has basically opened up the

12   whole.  So it is all at issue.  So you can't have it both as a

13   sword and a shield, which is the concept.

14           So a very helpful case, but factually distinct

15   because of that kind of angle on it.  So I get that.

16           Anything else?

17           MR. BRUEGGEN:  Judge, just to kind of build on that,

18   that's at a different point.  That would be later down the

19   line than the Flowers case, where earlier --

20           THE COURT:  You haven't taken the deposition, right?

21           MR. BRUEGGEN:  Yes.  I'm just trying to head off that

22   issue because it seemed like they had an agreement in that

23   case and then things kind of spun out of control.  I don't see

24   that happening here, but, again, it is just better to consider

25   it now and address it now than to come down the line and all

1    of a sudden have to redo a bunch of discovery because things

2    have changed or something of that nature.

3           Then the last thing is there is no better source of

4    the evidence available other than obtaining his mental health

5    records, and, obviously, we can do that in a very tight -- you

6    know, we don't have to go back ten years.  We can do a very

7    tight --

8           THE COURT:  What kind of time frame?  Because ten

9    years is too long.

10          MR. BRUEGGEN:  Yes.  I mean, we would do it -- I

11   think we asked for five years, but I think even two years

12   before would be relevant, and then, obviously, subsequent.  So

13   it would be, basically, a total of -- you are looking at about

14   five years, two years before and then it is almost like three

15   years after.

16          THE COURT:  Okay.  Anything else?

17          MR. BRUEGGEN:  No, that's it, Judge.  Thank you.

18          THE COURT:  Sorry for interrupting you.

19          Go ahead, Mr. Foutris.

20          MR. FOUTRIS:  I, obviously, disagree.

21          THE COURT:  With what?

22          MR. FOUTRIS:  With pretty much everything he said.

23          THE COURT:  Okay.  You can disagree with me, too.

24   That's fine.

25          MR. FOUTRIS:  First of all, I will start off with we

1    did take Defendant Krol's deposition yesterday.

2         THE COURT:  Okay.

3         MR. FOUTRIS:  He did verify he knew nothing about the

4    Plaintiff's state of sobriety, knew nothing about his mental

5    health.  He never interacted with him before.  He may have

6    interacted with him prior years before, but he wasn't sure of

7    when he actually arrested the Plaintiff's brother.  He said

8    that the Plaintiff might have been present at that time, but

9    he doesn't know.  So to start with, the Defendant himself knew

10   nothing about the Plaintiff's mental health.

11        THE COURT:  Okay.

12        MR. FOUTRIS:  And as far as the interaction itself,

13   there was nothing of the interaction itself that would, based

14   on what the Defendant had said, that would essentially put him

15   on notice that, perhaps, there was a mental health issue,

16   because he showed up on the scene, and he told the Plaintiff

17   to "Freeze, police."  The Plaintiff didn't.  He kept walking

18   away.  Then at some point he turned around and charged at

19   them.  While that's not necessarily something that a normal

20   human being might do faced with a police officer, it is still

21   not indicative of a mental health issue.

22        So there is no factual information, personal

23   knowledge, that this officer had of mental health, and their

24   defense is suicide by cop.  So they are trying to inject their

25   defense, or what they are saying is through their defense that

1    they want to advance, that allows them the ability to get into

2    the mental health treatment of the Plaintiff, if there were

3    any, and the cases that have considered that in Illinois, that

4    would be strictly prohibited if this were in Illinois.  There

5    is that Reda case.

6         And in the circuits that I have found, there is one

7    in the D.C. Circuit.  There is one in the Second Circuit.  I

8    didn't cite district court cases elsewhere for that

9    proposition, but the circuit court cases that I found that

10   directly addressed it, they both said, no, the defendants

11   cannot get at mental health treatment by injecting it on their

12   own, that the Plaintiff has to do it, and here the only place

13   where the Plaintiff has done it is through the boilerplate

14   language in the complaint, and I do submit it is boilerplate

15   language, and it is the garden variety, and it is as stated in

16   the answers to interrogatories.

17        So that's the primary thing is that Plaintiff, from

18   my position, has not injected mental health into this case,

19   and since the Plaintiff hasn't done that, then the Defendants

20   shouldn't be able to get it, no different than if I tried to

21   get -- and I have tried to get -- police officers'

22   psychological/mental health screenings before they are hired

23   by police departments many times, and every single time I'm

24   shot down.  I know there is a case out of this division that

25   has allowed it in the past, but generally speaking I have

1  never been able to get it.  So I think that's the one

2  exception.

3          THE COURT:  There you go.

4          MR. FOUTRIS:  Right.  There is exceptions, I suppose,

5  always.

6          THE COURT:  Because I know I have.  I know I have

7  allowed it.

8          MR. FOUTRIS:  Right.  I'm just saying that generally

9  speaking, it is not something I can get, and what I'm always

10  told is the same thing that I always argue as a plaintiff's

11  attorney, is that "I haven't put this into it," and my

12  intention is to not ask anything at all about mental health

13  treatment that my client has undergone, not ask about any

14  diagnoses.  So these are the things that I intend to do.

15          Again, I don't know what my client is going to do.  I

16  can't control a client at a deposition.  He may start saying

17  all sorts of things, and it may open the door, but that is not

18  what the intention is.  That is not what the intention has

19  been in this case.  But in a nutshell, our position is, my

20  position is, that we haven't injected it into the case, and

21  the Defendants don't get it just because they feel it will

22  help their defense.

23          THE COURT:  Okay.  Hold on one second.

24          Go ahead.

25          MR. BRUEGGEN:  Just to respond, Judge, I think here

1   it is different than trying to get an officer's mental health

2   history from when he signed up with the police force where it

3   is more of a fishing expedition.  Here we have basically

4   examples of suicidal comments, that there is this potential of

5   this suicidal nature of the Plaintiff.  I think it at least

6   warrants discovery into that.

7          Plaintiff argues that we are going to defend on a

8   suicide by cop.  That's not our intent.  That's a potential,

9   but we are defending based on a reasonable shooting,

10  reasonable use of force, and that might explain why the

11  Plaintiff did what he did, as Plaintiff's counsel said,

12  charged at the cop.  That might help provide context to why he

13  did what he did.

14         The other thing, again, this is just discovery.  We

15  are just seeking this to find out what is out there.  It may

16  turn out there is nothing to it, it may turn out there is

17  something to it, but, again, we will be having a similar fight

18  later on when it comes to trial for admissibility.  So we

19  think we are entitled to it from a discovery nature to find

20  out all the information about the Plaintiff, what he brought

21  to the situation, as Escobedo allowed.

22         MR. FOUTRIS:  The only thing I would add, Judge, is

23  this evidence about suicide and this evidence about

24  prescription medication and all that, that all came about

25  after the fact.  This is stuff that was uncovered either by

1  the Illinois State Police or by a search warrant to his

2  mother's house.  It is nothing they knew beforehand.  And in

3  the cases where there is suicide by cop, a lot of that stuff

4  is known ahead of time.  It doesn't usually come out after the

5  fact.  It has to do with what the officer knew at that time,

6  which he didn't know any of this.

7         Frankly, based on yesterday's deposition, he knew

8  that there had been a prior incident earlier on that shift

9  involving a domestic with his mother and that the Plaintiff

10  had a switchblade -- or not a switchblade, some type of a

11  knife on him at that time.  That's essentially all he knew.

12         MR. BRUEGGEN:  Judge, we would agree with that, that

13  it doesn't go to the Defendant's state of mind.  It goes to,

14  basically, the Plaintiff's state of mind, what he was doing at

15  the time, not what the Defendant knew.  We agree with that.

16         THE COURT:  Right.  They are not mutually exclusive.

17  Because it is an excessive force, it is slightly different

18  than search, probable cause, and what an officer knew.

19         So let me ask you this:  Mr. Foutris, he has already

20  said multiple times that they are only seeking "garden

21  variety" damages, and you take the Plaintiff's deposition, and

22  the Plaintiff says, "I felt bad, I was nervous, I couldn't

23  sleep for a little bit," that kind of stuff, and he doesn't

24  goes sideways like in Flowers, prompted by plaintiff's

25  counsel, by the way.  That would seem to address your concern

1   about damages, right?

2           MR. BRUEGGEN:  Yes, to some extent.  I mean, again,

3   it depends on how far he goes down that line.

4           THE COURT:  And that's why I said after the

5   deposition and making those assumptions, right?

6           MR. BRUEGGEN:  Yes.

7           THE COURT:  Okay.  That would address the damages

8   issue.

9           MR. BRUEGGEN:  Correct, Judge.

10          THE COURT:  And you have already said multiple times

11  that that's kind of where it is going.  Of course you can't

12  stop a plaintiff mid-sentence in a deposition.  I mean, you

13  can do it and say, "Here is what we are doing," but you can

14  still have a stipulation that addresses that, although I think

15  Judge Cole dropped a footnote and says it doesn't work that

16  way, but don't tell him I said that I would allow it.

17          That would address -- Mr. Foutris, would that address

18  from your perspective the damage component to it?

19          MR. FOUTRIS:  Yes, I mean if he sticks to what I hope

20  he sticks to.

21          THE COURT:  Okay.  All right.  We have all been in

22  depositions and been subjected to our client saying things

23  that we never ever knew was going to come out of their mouth,

24  and it flies out, and you are stuck with it.

25          So that would address -- I mean, what I'm leaning

1   towards is seeing how -- entering and continuing the motion to

2   see how the deposition plays out. That would address the

3   damages component to what's in front of me. It doesn't

4   address the relevance, corroborating evidence or lack thereof

5   issue, or even recollection, ability to recall. If someone is

6   on drugs or having a psychotic break, what's their ability to

7   recall, maybe a jury should hear that.

8        So Mr. Foutris is correct that generally, and you

9   agree, that generally if it is not known, it might not come in

10   at trial, but there is that Sherrod or Sherrod case, versus

11   Berry, and then Escobedo when that came out that talk about

12   not overruling but severely limiting a decision. It talks

13   about the officer may not know about it, but all this

14   information that the officer did not know can be used to

15   corroborate the officer's version of the events that a person

16   who is having those issues, whether they be drug-induced or

17   alcohol-induced or mental illness-induced, that their behavior

18   is consistent with one or the other. So my little

19   wait-and-see doesn't address that.

20        MR. FOUTRIS: Well, what I would say to that, Judge,

21   is a lot of those cases come out of the whole, was he armed or

22   wasn't he armed, where the plaintiffs say, "Well, he never had

23   a gun on him," and the question is, "Well, it doesn't matter

24   if he did or didn't," and the arguments that plaintiffs

25   oftentimes make are that, "Well, if he had -- if he did not

1   have a gun, then he would never have made that furtive

2   movement," and from my memory of the case law, it is

3   basically, "Well, he was unarmed, and it doesn't matter at the

4   end of the day."  That's just the way I recall that.

5          THE COURT:  Right.  And that's what some of those

6   cases -- you are correct, Mr. Foutris, some cases go that way,

7   but some also talk about it going beyond that.  It goes to

8   support the different versions of the events.

9          If the defendant says, "This person is acting

10  erratically, and I told the plaintiff/citizen to stop, to do

11  certain things, and they didn't do it," and that's their

12  version, and there is no video, and then the plaintiff

13  testifies, "I did everything they told me to do," now you have

14  got a conflict, which is why we have jury trials.  Then

15  evidence of mental health and drugs and alcohol can come in to

16  support the defendant's version that you have people who are

17  suffering from those effects, they don't listen to directions,

18  they act erratically, they charge, they do all those kind of

19  things, whether or not they have a weapon.  That's what I'm

20  struggling with.  I think we can address the whole damages

21  issue with a wait-and-see.  My concern is the other component

22  to it.

23         MR. FOUTRIS:  From my perspective, I think the Jaffe

24  court recognized that there is a psychotherapist/patient

25  privilege.

1          THE COURT:  There is.

2          MR. FOUTRIS:  I think what we are talking about still

3    is the Defendants overcoming that privilege by way of a

4    defense, and that's when I come back to this Second Circuit

5    and the D.C. Circuit cases which say that they can't get the

6    mental health in without the Plaintiff first injecting it

7    because it is a privilege.  It is no different than any other

8    privilege.

9          THE COURT:  It is a privilege.  Privileges can be

10   waived.

11         MR. FOUTRIS:  They can.

12         THE COURT:  And that's where the Doe case comes in,

13   and then the Taylor case addresses a lot of the issues that I

14   was struggling with, because when you read Doe, and it comes

15   way at the end, a Judge Posner afterthought -- "Here, I'm

16   going to screw this up for everybody with a couple

17   paragraphs" -- it talks about Jaffe.  It is a privilege.

18         So what you have is privilege, general proposition.

19   Privilege applies.  Exception at issue.  It is waived.  And

20   then exception to the exception unless it is garden variety.

21   So it is a three-step dance:  Privilege, waived, not waived if

22   it is garden variety.  So the question is, well, how was it

23   waived?  So you put it at issue, even with the boilerplate

24   that you discussed.

25         Doe says you do.  That's my reading of Doe, and I'm

1   not alone on that.  Not only does Judge Lee say that, I forgot

2   what other circuits do.  Well, somebody in the future may tell

3   me that I am misreading Doe and that I will just be in a group

4   of people that have misread Doe.  There is a bunch of us.

5           So Doe, my reading of Doe, puts the Seventh Circuit

6   in the "It is waived just by pleading it."  I don't like that,

7   and that's why I think you have the cases.  You have Judge

8   Kennelly's decision before Doe, going through the whole

9   analysis, and it makes some sense, and then Doe comes out, and

10  then you have got the judges kind of figure out, "Okay, well,

11  where does this land?"  It is a pretty harsh result, and

12  that's why I think you get the decisions where people are

13  trying to avoid making the decisions, like I'm trying to do

14  right now, okay, because I think that's what Doe says.

15          And then Judge Lee's decision in Taylor, it addresses

16  all those issues, including whether there was an intentional

17  infliction of emotional distress claim, because I remember

18  that Doe case, and then there was one, but then they dropped

19  it.  So I thought maybe that was the reason, the unstated

20  reason for Doe, but because that claim was voluntarily

21  dismissed, it couldn't have been, unless somebody didn't see

22  it.

23          So here is what we are going to do:  Take the

24  Plaintiff's deposition.  I'm going to enter and continue the

25  motion.  We will see what happens at the deposition.  We will

1  have a status after that and we will see where things stand.

2  If that's the testimony, "I couldn't sleep for a couple days,"

3  those type of things, "I've lost weight, I've lost weight,"

4  you know, that's all sort of the garden variety.  "I was

5  nervous and all that, I was nervous for a while, I felt

6  depressed for a week," okay, yes, that's garden variety.

7       If it is "I won't leave my house, I'm terrified of

8  anybody who has a sidearm, my hair is falling out, I have lost

9  200 pounds, all because" -- okay, well, then, now we have got

10  a different issue.  So let's see how that deposition testimony

11  comes about, and I will enter and continue the motion.

12       MR. BRUEGGEN:  Judge, what about the Escobedo issue,

13  about the Plaintiff -- you take the Plaintiff as he interjects

14  himself, with what he brought to the situation?

15       THE COURT:  That's why I have entered and continued

16  the motion.

17       MR. BRUEGGEN:  Okay.  So then would we be entitled to

18  a second deposition of the Plaintiff if he opens the door to

19  mental health?  We would then be able to subpoena his mental

20  health records and re-depose him on those issues?

21       THE COURT:  I have a feeling Mr. Foutris is going to

22  talk to his client a couple of times before the deposition.

23  If it happens, do this, call me from the deposition and let me

24  know what is going on, okay?

25       And then as to the, what we will call, the "Escobedo

1   issue," that's why I'm entering and continuing the motion,

2   okay?  Because that's a separate issue in my mind.

3           MR. FOUTRIS:  I mean, I know it is a separate issue,

4   Judge, but just from my perspective, practically speaking, if

5   it is going to end up coming in on one issue or the other,

6   then I may as well not, you know --

7           THE COURT:  That's a good point.  Why limit it?

8           MR. FOUTRIS:  Right.

9           THE COURT:  Well, think about it.  You kind of know

10  where I'm going.

11          MR. FOUTRIS:  I know.

12          THE COURT:  Think about it, and then why don't

13  you -- do we have a date for the Plaintiff's deposition?

14          MR. FOUTRIS:  We don't, Judge.

15          MR. BRUEGGEN:  We have a tentative timing based on

16  Mr. Foutris's trial schedule.  He is kind of slammed the next

17  couple of months.

18          THE COURT:  I just told him that.

19          MR. FOUTRIS:  Right.  I had a couple trials that I

20  thought were going to settle, and they are not.  So one of the

21  things we were -- well, not "we," but I was going to ask

22  today, and I don't like to ask for extensions, but I was going

23  to ask for an extension of fact discovery.  Right now we have

24  until the end of August.  Just to let the court know the

25  rationale for it, I have a trial in May, a trial in June.  The

1    one in June will probably take at least a week just for jury

2    selection.

3            THE COURT:  Extend fact discovery until November 2nd,

4    2018.

5            MR. FOUTRIS:  I would ask, if we could, until the end

6    of the year.

7            THE COURT:  I will give you that, but that will be

8    the drop dead.  I won't move it beyond that.

9            MR. FOUTRIS:  Right.

10           THE COURT:  Okay.  That will be the drop-dead date,

11   12/31/2018.

12           Expert deadlines remain reserved.

13           I will strike the dispositive motion date.  That's

14   set for October 31st.  I will strike that and set it for -- it

15   is an excessive force case; please don't file a dispositive

16   motion -- January 31st for dispositive motions.  That's

17   January 31st, 2019.

18           What's your best estimate on deposing the Plaintiff?

19   When do you think that --

20           MR. BRUEGGEN:  End of June.

21           THE COURT:  Realistically.

22           MR. FOUTRIS:  We were talking about the end of June.

23   We do have -- we took the Defendant's deposition yesterday.

24   The two first responding officers -- I think were the first

25   two responding officers, after the fact -- are being deposed

1 tomorrow, and we don't have any other set depositions pending

2 today's motion hearing --

3          THE COURT:  Okay.

4          MR. FOUTRIS:  -- and some scheduling issues.

5          THE COURT:  July 10th at -- I can do 9:00 or 1:30 for

6 a telephonic.

7          MR. FOUTRIS:  I may be out of the country, but if I

8 am -- right now that works, Judge.

9          THE COURT:  Okay.

10          MR. FOUTRIS:  But --

11          THE COURT:  They still have phones in Greece, right?

12          MR. FOUTRIS:  Huh?

13          THE COURT:  They still have phones in Greece?  I

14 don't know the time difference.

15          MR. FOUTRIS:  Eight hours.

16          THE COURT:  Okay.  Do you want to go with the 17th?

17 Will you be back by then?

18          MR. FOUTRIS:  I would ask that we keep it to the

19 10th, and if for whatever reason I do end up being out of

20 town, I may contact counsel and see if we can, with the

21 court's permission, of course, move it back a week or two

22 after that, depending on when that is.

23          THE COURT:  So 7/10.

24          MR. BRUEGGEN:  7/10 is fine.

25          THE COURT:  9:00 or 1:30?

```
 1          MR. FOUTRIS:  Doesn't matter to me.

 2          MR. BRUEGGEN:  Either one.

 3          THE COURT:  Let's put it at 1:30.

 4          So it will be entered and continued.  You know where

 5  I'm coming from, okay?

 6          MR. FOUTRIS:  Thank you, Judge.

 7          MR. BRUEGGEN:  We will talk in the meantime and see

 8  if we can't sort things out otherwise.

 9          THE COURT:  And if you need a settlement conference,

10  you let me know.

11          MR. FOUTRIS:  Thank you, Judge.

12          THE COURT:  Thank you.

13    (Which were all the proceedings heard.)

14                          CERTIFICATE

15    I certify that the foregoing is a correct transcript from

16  the record of proceedings in the above-entitled matter.

17  /s/ Heather M. Perkins-Reiva            May 9, 2018

18  _____    _____
    Heather M. Perkins-Reiva                      Date
19  Official Court Reporter

20

21

22

23

24

25
```